## CALIFORNIA MORTGAGE & SAVINGS BANK v. HAMPTON.

### L. A. No. 567; July 11, 1899.

#### 57 Pac. 1073.

**Deeds—Construction by Acts of Parties.—Defendant Conveyed Part** of a tract of land, and a fence was constructed by him and a subsequent grantee so as to include the land described in the conveyance and an additional piece belonging to him, and the land was subsequently conveyed to plaintiff by a description following the line of the fence. Defendant claimed that after the fence was constructed he discovered that it included too much land, and so notified the owner, but took no steps to have it moved, and allowed it to remain for twenty years, and in conveying an adjoining piece had it surveyed, and used a description corresponding to the line of the fence. Held, in an action to quiet title to the additional piece on the ground that it should have been included in the original conveyance by defendant, that the subsequent acts of the parties had established plaintiff's title.

**Quieting Title—Judgment.—Where,** for Twenty-three Years Previous to an action to quiet title, defendant had maintained a dam across a stream at a point where it intersected the line between his land and the land in controversy, thereby backing the water over a part of the land involved so as to divert it into his ditch, and in the action, while alleging title to the land, he fails to allege a right to flow it, merely alleging riparian rights in the stream, he cannot complain that the judgment declaring that he had no interest in the land, but allowing him to maintain the dam, does not also give him the right to divert the water, and flow plaintiff's land.

APPEAL from Superior Court, San Luis Obispo County.

Action by California Mortgage and Savings Bank against George W. Hampton and Julia H. Hampton. Judgment for plaintiff and defendants appeal. Affirmed.

W. H. Spencer for appellants; Venable & Goodchild for respondent.

CHIPMAN, C.—Action to quiet title. Plaintiff had judgment, from which, and from an order denying motion for a new trial, defendants appeal.

It appears that in 1876 defendants were the owners of the south one-half of the southeast one-quarter of section 22, township 30 south, range 12 east, situated in San Luis Obispo

county. They in that year conveyed to one Andrews, by metes and bounds, a portion of said land by the description given in the answer, to which defendants disclaim ownership. In 1877 Andrews conveyed this piece of land by the same description to one Breed and he, in 1887, conveyed the land by the same description to one Dutton, and he, in 1897, by the same description, conveyed it to plaintiff, and ten days thereafter conveyed by quitclaim to plaintiff by the description given in the complaint. This latter description coincides exactly with the tract as it was fenced by Breed, a part of which fence was built by defendants, and which remains to-day the same as when built in 1877. The fenced tract is known as the "Dutton Place." A map attached to the original transcript shows this description by a black line, which follows around the tract as the fence is built; and by a dotted line the land described in the answer is shown when run according to the courses and distances, but disregarding the calls or stations. The map also shows a piece of land formerly owned by defendants, part of the original tract, lying east of the Dutton place, which defendants conveyed to one Preston in 1894. This deed is in evidence, and its calls, so far as they describe the line dividing the Dutton place from defendants' land sold to Preston, coincide with the line of fence built in 1877, and it is in evidence that Hampton assisted in making this Preston survey; and the surveyor, Story, testified that he had no recollection that Hampton told him that he owned any land within the Dutton fence. Dutton testified that he had been in possession of the tract as fenced since 1882 and bought it in 1887, and that no one but himself ever claimed to own it since that time; and he did not admit ownership in anybody else at any time. Hampton testified that he told Breed that he (Breed) had some of his (Hampton's) land inclosed, and he also testified that he so told Dutton, but this latter statement is disputed by Dutton. Hampton also testified that the fence is now where it was built originally in 1887; that he built about twelve or thirteen chains of the line, commencing on the south side of his land, and Breed built the balance, and that the fence inclosed about three-quarters of an acre too much, because Breed commenced building the line on the second course two chains farther south than it should be; that he found this out by measuring the first line with a tape soon after the fence was built, and that he told Breed of it at the

time. It seems, however, that he took no steps to have the fence moved, and allowed it to remain for twenty years, and until after Dutton bought; and when he sold the piece of land contiguous to the Dutton place on the east he had it surveyed, and the description which he caused to be put in the deed to Preston corresponded with the line of fence, and was a recognition of the correctness of its location. The real controversy centers upon the question whether the first call in the Andrews deed for a line, "north 18.20 chains to post 2," was wrong, and should have been 16.25 chains, as the fence gives it. Aside from the conduct of the parties interested in recognizing the line to be 16.25 chains, as the fence shows it should be, the third call of the Andrews deed, which is 4 chains running north, added to the 16.25 chains, makes 20.25 chains, which nearly corresponds with the actual width (20 chains) of Hampton's entire tract. But if we add 4 chains to 18.20, as the Andrews deed called for in the first line, we have 22.20 chains, or 2 chains north of Hampton's north line. It is, of course, possible that the third line was too long and the first line right; and the second call, which runs to the creek, points that way. It seems, however, that all the calls are to posts, and these monuments would govern, if ascertained, rather than the distance or length given for the line; and, as the fence was built shortly after the Andrews deed was made, it is altogether probable that the fence was built to these established posts as corners and known monuments. At any rate, the subsequent conduct of the parties, we think, should be taken to remove any doubt there may be as to the real fact. It may be added that counsel for respondent state— what is not disputed—that a computation of the acreage according to the fence boundaries makes within the fraction of one one-hundredth of an acre of the acreage called for in the Andrews deed (25.70), while, if the first line in the Andrews deed is taken as correct, and the third as 2 chains too long, the acreage would be 25.01, or about seventy one-hundredths of an acre less than the deed calls for.

2. The court found that "defendants have no interest in said parcel of land . . . . except only that they have the right to maintain a dam across the Stenner creek where the same intersects the east line of said parcel of land in such manner that the west end of said dam may be (as at present) within said parcel of land." The only evidence as to any claim to

the water of this creek was given by Mr. Hampton, upon cross-examination, when called as a witness for plaintiff. He testified: "There is about three-quarters of an acre of land in dispute here, caused by Breed's fence, on the second line from the starting point according to Story's map, being two chains farther south than it should be. My water dam backs the water over about one-eighth of this three-quarters of an acre to get it in my ditch, and has done so every year for the past twenty-three years. No one has ever objected to my use of the water until this suit was commenced." The judgment reads: "And the defendants are hereby perpetually debarred from asserting any claim whatever in or to said land, or in or to the waters flowing in Stenner creek on said land, adverse to plaintiff, with the proviso that defendants have the right to maintain a dam across Stenner creek where the same intersects the east line of said parcel of land in such manner that the west end of said dam may be (as at present) within said parcel of land." Appellants complain that this is giving a stone where bread was asked, for the right to erect the dam is of no value if there be no right given to divert the water of the creek thereby as they had been doing for twenty-three years. Plaintiff claimed the right, as riparian owner, to the water of this creek flowing through its land. Defendants, in their answer, claimed an interest in the water as riparian owners only. Defendants could not have any greater relief than they claimed, and they made no claim as appropriators; indeed, the answer prays for no relief whatever. The evidence is certainly very meager as to defendants' right to the water, and there is none at all as to plaintiff's. As owners of the soil, both plaintiff and defendants were riparian proprietors. The judgment is that defendants shall assert no claim "to the waters flowing in Stenner creek on said land (i. e., plaintiff's land) adverse to plaintiff." We do not understand this to interfere with defendants' rights as riparian proprietors. They have the right adjudged in their favor to erect the dam as heretofore, which seems to be all and more than they asked. If they had desired the further right to flow the lands of plaintiff—to have an easement to back the water over plaintiff's land—they should have so alleged in their answer in some appropriate manner. We cannot see that the judgment restrains defendants from using water on their own land as

riparian proprietors.  It is advised that the judgment and order be affirmed.

We concur: Gray, C.; Haynes, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order are affirmed.